[No. D030320. Fourth Dist., Div. One. July 7, 2000.]

BARBARA KITZIG, Plaintiff and Appellant, v.
WILLIAM NORDQUIST et al., Defendants and Appellants.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Discussion section, parts III., IV., V., VI., VII.

## COUNSEL

Higgs, Fletcher & Mack, John Morris, Jon R. Williams; Law Offices of Antoinette Buzzell Cincotta, Antoinette Buzzell Cincotta, Can M. Sirin; Law Offices of Robert E. Boyce and Laura G. Schaefer for Plaintiff and Appellant.

McInnis, Fitzgerald, Rees & Sharkey, Gregory W. Pollack; Lewis, D'Amato, Brisbois & Bisgaard and Marilyn R. Moriarty for Defendants and Appellants.

## OPINION

**HALLER, Acting P. J.**—Barbara Kitzig sued her former dentist, Dr. William Nordquist, for professional negligence, breach of contract and fraud, alleging he improperly placed dental implants, failed to provide a fixed

crown and bridge, and misrepresented his qualifications and expertise. A jury awarded Kitzig damages on her negligence and breach of contract claims, but found she failed to prove damages arising from Dr. Nordquist's fraud. Each party appeals.

In the published portion of this opinion, we hold (1) substantial evidence supports the jury's finding that the limitations period did not begin to run when Kitzig consulted with a second dentist during her ongoing dentist-patient relationship with Dr. Nordquist; and (2) the court did not err in failing to require the jury to allocate fault to Kitzig's prior dentist under Proposition 51. (Civ. Code, § 1431.2.) We affirm the judgment in its entirety.

## FACTUAL AND PROCEDURAL SUMMARY

In January 1992, Kitzig first consulted Dr. Nordquist for an evaluation of work performed by her former dentist, Dr. Ernest Tarr, and then current dentist, Dr. Ronald Evasic. At the time, Kitzig had a dental malpractice lawsuit pending against Dr. Tarr based on his extracting all but three teeth in her upper jaw, and she was experiencing pain from a denture placed by Dr. Evasic. Kitzig was attracted to Dr. Nordquist by his advertisement in Senior World magazine, which represented that he had a 98 percent success rate with his dental implant patients. At Kitzig's first or second visit, Dr. Nordquist gave Kitzig a brochure representing he was an "implantologist" and a "diplomate" in several areas of dentistry. Kitzig was impressed by these credentials and left Dr. Evasic's care to see Dr. Nordquist for her dental treatment.

Although Kitzig desired "fixed" (not removable) teeth, Dr. Nordquist advised Kitzig she was not a good candidate for fixed teeth unless he augmented her bone with synthetic bone and performed sinus surgery. Kitzig agreed to his recommendation for detachable teeth. In February 1992, Dr. Nordquist performed the first of eight surgeries, extracting the remaining three teeth in Kitzig's upper jaw and augmenting the bone in the sockets. In May 1992, Dr. Nordquist performed a second surgery on Kitzig in order to place five implants. When he attempted to place the fifth implant, the implant slipped into Kitzig's sinus.

After this surgery, Kitzig again expressed a desire for fixed teeth. Dr. Nordquist assured her he could give her fixed teeth and formulated a second

treatment plan requiring bilateral sinus lift surgery[2] and placement of eight dental implants and 12 units of crown and bridge.

In October 1992, Dr. Nordquist performed the sinus surgery and attached certain devices to the four previously placed implants. Dr. Nordquist failed to use live bone cells in this procedure, creating the potential for infections and other problems. About two and one-half weeks later, Kitzig began experiencing breathing problems, dizziness, and headaches. She sought treatment from a physician, who put her on steroid medication. She also asked Dr. Nordquist about her breathing problems; he told her they "didn't have anything to do with the implants." The evidence showed these breathing problems were caused by infections resulting from the surgery.

Kitzig continued under Dr. Nordquist's care into 1993, seeing him for cleaning and adjustments. In June 1993, Kitzig experienced pain and found pus in her mouth; Dr. Nordquist confirmed she had an infected implant, prescribed antibiotics and scheduled surgery. In July 1993, he attempted to salvage the infected implant by cutting it off at its base. This was not an appropriate treatment for an infected implant.

In October 1993, Dr. Nordquist performed another surgery to place four more implants. As far as Kitzig knew, the surgery went well. According to Dr. Nordquist, part of the bone graft did not take, but he was able to place implants into that area.

On March 7, 1994, Kitzig underwent another surgery to attach devices to her newest implants. One week later, Dr. Nordquist noted that the implants looked good and were healing. In April, however, Kitzig heard what she described as a "nail going into plaster" and returned to Dr. Nordquist. He discovered one of the implants had pushed up into her sinus and had become infected. Dr. Nordquist removed the implant from her sinus through an unhealed window in her bone and sutured the hole and the membrane closed.

On May 9, 1994, Kitzig returned to Dr. Nordquist after she experienced food escaping from her nose when she ate, and bubbles coming from her nose when she brushed her teeth. Dr. Nordquist found that Kitzig had an opening between her mouth and sinus. He told Kitzig she had a hole in her sinus and said it would probably close on its own. According to Kitzig, he was "not really" concerned about it and said it "was just something that happens."

---

[2] In a bilateral sinus lift procedure, the floor of the maxillary sinus, which rests above the posterior teeth and below the eye socket on both sides, is built up with hydroxyapatite (a man-made substance identical to the inorganic component of real bone), demineralized freeze-dried bone from a cadaver, or autogenous bone (bone from one's own body) to create enough material in the upper jaw to accommodate implants.

Eleven days later, on May 20, 1994, while visiting her husband in Los Angeles, Kitzig went to see a prosthodontist, Dr. Nishimura, at the UCLA dental school because of her concern with the sinus opening. Dr. Nishimura examined her mouth, advised Kitzig that "everything looked okay," and that she should return to Dr. Nordquist to have the opening closed.

The next month, Dr. Nordquist performed surgery to close the opening in Kitzig's sinus. During this surgery, Dr. Nordquist placed a gold foil patch on the opening. Kitzig continued to believe "[e]verything [was] fine." She continued to see Dr. Nordquist regularly: in August to take an impression, in September to try a new temporary denture, three times in October to adjust the new denture, and in mid-November for another adjustment.

On November 21, 1994, Kitzig, believing Dr. Nordquist was out of town, saw her husband's dentist, Dr. Graham Simpson, to alleviate a sore spot on her denture. Dr. Simpson neither performed a complete examination of Kitzig's mouth nor examined her implants that day. They discussed the appearance of her dentures, and he assured her they looked okay.

On March 20, 1995, Kitzig kept an appointment with Dr. Nordquist, believing she was to be prepared for her permanent teeth. While removing a bar from her upper implants, Dr. Nordquist tapped another implant out of her mouth, a very unusual occurrence. Kitzig's husband, feeling "something wasn't right" and that Kitzig was losing too many implants and suffering from too many infections, called Dr. Simpson's office. They saw Dr. Simpson the next day. Dr. Simpson examined Kitzig's implants and found that the implants were failing. He recommended she return to Dr. Nordquist to have him reevaluate the work.

Although she "didn't feel really good about it," Kitzig returned to Dr. Nordquist to have him fix another hole in her sinus. She arrived for surgery in early April 1995 but was informed by Dr. Nordquist that the opening had closed on its own. He placed a bar connecting the remaining implants and took impressions for a denture. Kitzig's last appointment with Dr. Nordquist was on April 5, 1995.

In August 1995, Kitzig began treatment with oral surgeon, Dr. Joel Berger. Kitzig was suffering from substantial pain in her jaw. Dr. Berger found that six of Kitzig's seven implants were failing and were infected. Dr. Berger told Kitzig it was necessary to "start from scratch." In January 1996, Kitzig underwent extensive surgery in which all of the implants were removed, her sinuses were cleaned of the artificial bone material, and live bone cells were used to augment her jaw bone.

Because of Dr. Nordquist's numerous surgeries and her existing infections, Kitzig had "scarred, leathery" tissues and had a very "rough postoperative course" with substantial pain. Kitzig was in so much pain that her doctors "didn't know how she really held up." For many weeks after, she could not "even come[] close to touching" her upper jaw; even sucking on a straw was painful. Dr. Berger performed several more surgeries on Kitzig during the next year. Because of Dr. Nordquist's negligence, Kitzig's only future option is to have implants; if the implants are not successful, Kitzig will never again have upper teeth.

In January 1996, Kitzig served Dr. Nordquist with her notice of intention to sue. (Code Civ. Proc., § 364.) Three months later, she filed her complaint. As amended, the complaint alleged causes of action for dental malpractice, breach of contract, and fraud.

At trial, Kitzig's expert witness testified Dr. Nordquist's treatment fell below the standard of care by failing to use real bone cells in the mix used to rebuild Kitzig's upper jaw; failing to obtain Kitzig's informed consent by not giving Kitzig the option of using real bone; placing implants in bone inadequate to support them; using a gold patch to repair the hole in her sinus; and failing to replace Kitzig's failed implants and artificial bone grafts. The expert testified that Dr. Nordquist inappropriately treated Kitzig's infection by cutting off a piece of the implant and acted improperly by inverting Kitzig in her chair and having her blow through her nose to remove a failed implant that had fallen into her sinus. Another expert testified that Dr. Nordquist violated the standard of care by placing a denture as long-term treatment on failing implants.

By special verdicts, the jury found Kitzig's negligence claim was not barred by the statute of limitations; Dr. Nordquist was negligent in Kitzig's treatment and his negligence caused her damage; Dr. Nordquist breached his contract with Kitzig; and Dr. Nordquist made material misrepresentations on which Kitzig reasonably relied, but the misrepresentations did not cause Kitzig damages. With respect to the negligence claim, the jury found Kitzig incurred $66,113 in economic damages and $435,000 in pain and suffering damages. The jury apportioned 95 percent of the total fault to Dr. Nordquist, 4 percent of fault to Kitzig, and 1 percent of fault to Dr. Carl Smith, another dentist who had examined Kitzig in connection with Kitzig's malpractice action against Dr. Tarr.

The court later denied Dr. Nordquist's motions for new trial and judgment notwithstanding the verdict.

DISCUSSION

I. *Statute of Limitations*

Dr. Nordquist contends insufficient evidence supported the jury's finding that Kitzig filed a timely claim.

The parties agree that Code of Civil Procedure section 340.5 sets forth the applicable statute of limitations for dental malpractice. It provides that a plaintiff must commence his or her action "three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first."

Kitzig began her legal action in January 1996. In response to Dr. Nordquist's statute of limitations defense, Kitzig argued that her claim was timely because she did not discover her injuries were caused by wrongdoing until March 1995, when she saw Dr. Simpson the second time. By finding Kitzig's claim timely, the jury presumably agreed with this argument. ▉ Dr. Nordquist contends there was insufficient evidence to support the jury's finding because Kitzig admitted at trial that she "suspected" Dr. Nordquist of wrongdoing when she went to see Dr. Nishimura in May 1994.

▉ Under Code of Civil Procedure section 340.5's discovery rule, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing . . . ." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110 [245 Cal.Rptr. 658, 751 P.2d 923]; see *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397-398 [87 Cal.Rptr.2d 453, 981 P.2d 79].) This rule sets forth two alternate tests for triggering the limitations period: (1) a subjective test requiring actual suspicion by the plaintiff that the injury was caused by wrongdoing; and (2) an objective test requiring a showing that a reasonable person would have suspected the injury was caused by wrongdoing. (*Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at p. 1110.) The first to occur under these two tests begins the limitations period.

As he did at trial, Dr. Nordquist concedes there was no basis for the jury to find Kitzig should have suspected her injury was caused by wrongdoing; the fact some implants had failed and that she had various other related medical problems did not put her on notice that the cause of these problems was malpractice. This concession is certainly reasonable. "The best medical treatment sometimes fails, or requires long and difficult recuperation, or produces bad side effects." (*Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 899

[218 Cal.Rptr. 313, 705 P.2d 886].) "The mere fact that an operation does not produce hoped-for results does not signify negligence and will not cause commencement of the statutory period." (*Bristol-Myers Squibb Co. v. Superior Court* (1995) 32 Cal.App.4th 959, 964 [38 Cal.Rptr.2d 298], disapproved on other grounds in *Norgart v. Upjohn Co., supra,* 21 Cal.4th 383, 410, fn. 8.)

 Dr. Nordquist instead asserts that this case falls into the subjective prong of the discovery rule because Kitzig "admitted" at trial that when she went to see Dr. Nishimura she subjectively "suspected" the failure of her implants was caused by wrongdoing.

The evidence with respect to Kitzig's visit with Dr. Nishimura was as follows: In May 1994, Kitzig's husband was living in Los Angeles because of a job transfer. While Kitzig was visiting him, Kitzig's husband noticed that food would come out of Kitzig's nose while she was eating. In response to this incident, Mr. Kitzig wanted to "see what's going on" and made an appointment at the UCLA dental school. At trial, Kitzig explained that she went to Dr. Nishimura "to check [the] hole that water and bubbles were coming out of." She said she was "suspicious" Dr. Nordquist may have done something wrong because she "had that hole in [her] sinus and water and bubbles were coming out." She wanted Dr. Nishimura "to examine the implants and tell me about that hole in my sinus." After Dr. Nishimura examined Kitzig, he told her that everything looked "okay" and that she should go back to Dr. Nordquist "and get the hole closed."

Kitzig testified that after her visit with Dr. Nishimura she was reassured that the hole was not a significant issue and that "[e]verything [was] fine." When she returned to San Diego shortly thereafter, Kitzig made an appointment with Dr. Nordquist, and Dr. Nordquist then sealed the sinus hole with gold foil. For the next year, Kitzig continued to see Dr. Nordquist on a regular basis, believing she would soon obtain the permanent teeth. It was not until March 1995, when the implant came out during surgery, that Kitzig began to suspect that the implants were failing and that these failures and her various other medical problems might be attributed to Dr. Nordquist's wrongdoing.

This evidence did not establish as a matter of law that the limitations period was triggered in May 1994.

First, Kitzig's "suspicions" leading her to consult with Dr. Nishimura did not pertain to the injury for which she later sought recovery. Viewed in the light most favorable to Kitzig, her testimony reflects that she went to Dr.

Nishimura for the limited purpose of addressing her concern about the "hole in [her] sinus." Dr. Nordquist had already assured her the hole would probably close on its own, and after personally viewing Kitzig's symptoms, her husband wanted to make sure that this advice was correct. At trial, the fact that the implant had slipped into her sinus and created the hole was not a basis for her negligence claims. Instead, she asserted several discrete areas of wrongdoing—none of which concerned possible negligence in the creation of the hole in her sinus.

Second, it is not the law that a person who obtains a second medical opinion while under the care of her personal physician and the second physician confirms that her physician is "doing nothing wrong" and then she continues her treatment with her physician, is under an obligation—as a matter of law—to bring suit within one year. Although the subjective prong of the discovery rule requires merely a suspicion " 'that someone has done something wrong' to him" (*Norgart v. Upjohn* Co., *supra*, 21 Cal.4th at p. 397), a patient "is fully entitled to rely upon the physician's professional skill and judgment while under his care, and has little choice but to do so." (*Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 102 [132 Cal.Rptr. 657, 553 P.2d 1129]; *Unjian v. Berman* (1989) 208 Cal.App.3d 881, 886 [256 Cal.Rptr. 478].) While this reliance may not be justified if the patient actually suspects wrongdoing (see *Sanchez v. South Hoover Hospital, supra,* 18 Cal.3d at p. 102), this suspicion must be meaningful by having some effect on the patient's ongoing relationship with her doctor. (See *Brown v. Bleiberg* (1982) 32 Cal.3d 426, 438, fn. 9 [186 Cal.Rptr. 228, 651 P.2d 815]; see also *Kilburn v. Pineda* (1982) 137 Cal.App.3d 1046, 1048-1050 [187 Cal.Rptr. 548].)

Kitzig's testimony made clear that her briefly held "suspicion" regarding the hole in her sinus had no effect on her continuing relationship with Dr. Nordquist and that she continued to rely exclusively on Dr. Nordquist's medical judgment. A finding that Kitzig was required to bring suit under these circumstances is inconsistent with the accepted practice of obtaining a second opinion during ongoing medical treatment. Holding that seeking a second opinion *necessarily* triggers a malpractice statute of limitations whenever a patient is motivated by a possible suspicion—however momentary—that her doctor was "doing something wrong" would hinder a patient's ability to obtain the best medical care. Under Dr. Nordquist's analysis, obtaining a second opinion based on a subjective "concern" with a patient's ongoing medical treatment would terminate the validity of the first doctor-patient relationship because at that point the patient would be placed in the position of conducting a full investigation—even if the second doctor confirms that the first doctor is doing everything right. An injured party cannot,

and should not, be expected to file a lawsuit against her current doctor when she subjectively and justifiably believes the lawsuit would be meritless.[3]

The cases relied upon by Dr. Nordquist are inapposite.

First, in *Gutierrez v. Mofid, supra,* 39 Cal.3d 892, a woman brought a medical malpractice action after doctors performed a hysterectomy in an operation that had been described to her as an exploratory procedure to remove an appendix or a tumor. She suspected malpractice immediately after the operation, *and this suspicion was confirmed by several doctors within two or three months of the operation. (Id.* at p. 896.) She nonetheless argued that the accrual period was tolled because she consulted with an attorney who told her she did not have a viable malpractice claim. The court rejected this contention, holding that under the discovery rule "the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the *facts* essential to his claim." (*Id.* at p. 897.) The court stated there was no reason to depart from this rule where *"despite plaintiff's discovery of the facts constituting his claim,* and without defendant's fault," an attorney dissuades the plaintiff from filing suit. (*Id.* at p. 899, italics added.)

Here, unlike *Gutierrez,* Kitzig did not seek to toll the limitations period based on improper advice about the legal significance of known facts. Instead, she presented evidence from which a jury could properly conclude she did not suspect her continuing dental problems were caused by Dr. Nordquist's wrongdoing. She further presented evidence, and the jury found, that she did not "discover" these facts merely because she was briefly suspicious when she consulted with a second dentist who then confirmed the correctness of her current dentist's treatment. This finding—which is based on delayed discovery of the facts, not a delayed understanding of the law—is fully consistent with the *Gutierrez* decision. Moreover, unlike *Gutierrez,* in this case we do not have a "wholly uninvolved defendant." (*Gutierrez v. Mofid, supra,* 39 Cal.3d at p. 900.) Dr. Nordquist remained involved and continued to treat Kitzig and assure her there were no problems. Kitzig certainly had a reasonable basis to rely on this advice. The jury had ample

---

[3]The dissent characterizes this conclusion as establishing a "new" rule that "a malpractice plaintiff who (a) experiences the effects of actual malpractice and (b) actually suspects her physician's negligence" may *"toll the statute of limitations indefinitely until another healthcare provider expressly confirms or diagnoses the negligent treatment."* (Dis. opn., *post,* at p. 1402, italics added.) Respectfully, this assertion is not supported. Our discussion cannot be reasonably interpreted to mean the limitations period is tolled until another healthcare provider confirms or diagnoses the existence of negligence. Rather, we hold only that under the particular circumstances here, the plaintiff's subjective concerns leading to a consultation with a second dentist during her ongoing dental treatment did not as a matter of law trigger the limitations period. This conclusion does not support an inference that an express (or implied) confirmation of negligence is required before the limitations period begins.

basis to find that Dr. Nordquist, unlike the doctors in *Gutierrez,* was a continuing participant in forestalling the filing of the claim.

Dr. Nordquist's reliance on *Kleefeld v. Superior Court* (1994) 25 Cal.App.4th 1680 [31 Cal.Rptr.2d 12] is similarly misplaced. In *Kleefeld,* the plaintiff twice expressed his view to state investigators that the defendant chiropractor had inappropriately treated his wife and that this treatment caused her death. (*Id.* at p. 1682.) The plaintiff made these statements within three months after his wife died. The plaintiff nonetheless waited almost two years to file his wrongful death complaint. In finding the plaintiff's action was untimely, the court rejected the plaintiff's argument that his action was timely because he demonstrated diligence in contacting the state board after he became suspicious. (*Id.* at p. 1684.) The court reasoned that "a plaintiff's diligence after he has become suspicious of wrongdoing is not relevant to the running of the statute of limitations . . . . Once a plaintiff actually has the requisite suspicion, the statute of limitations commences to run. It is not tolled by efforts to learn more about the matter short of filing suit." (*Ibid.,* italics omitted.)

These comments are inapplicable here. Unlike the *Kleefeld* plaintiff, Kitzig did not wait until she confirmed her suspicions to file a lawsuit. Rather, there were facts showing that Kitzig did not have the requisite suspicion that her injuries were caused by Dr. Nordquist's negligence more than one year before she filed the lawsuit.

Our conclusion is further consistent with our Supreme Court's recent discussion of the delayed discovery rule. *(Norgart v. Upjohn Co., supra,* 21 Cal.4th at pp. 395-399, 404-410.) In *Norgart,* the court confirmed that under the discovery rule the limitations period begins to run when the plaintiff "suspects a factual basis . . . for its elements," i.e., when the plaintiff suspects " 'that someone has done something wrong' to him [or her]." However, because *Norgart* was a wrongful death action brought against a drug manufacturer, the court did not consider the issue presented here concerning the nature of the subjective suspicion necessary to trigger the limitations period during the continued existence of a doctor-patient relationship. Nothing in *Norgart* supports a conclusion that the limitations period is triggered as a matter of law where both the malpracticing doctor and a consulting professional continue to reassure the plaintiff that everything is fine, the plaintiff subjectively relies on these reassurances while continuing treatment with her doctor, and this reliance is reasonable.

Dr. Nordquist asks us to hold as a matter of law that a suspicion automatically triggers the limitations period where (1) a briefly held concern is

immediately abated after consulting with a respected medical doctor; (2) there is no discontinuation of the original doctor-patient relationship; and (3) there is no objective basis for the patient to have known or discovered the alleged malpractice. We decline to do so. A finding that Kitzig was required to bring suit under these facts undermines the purpose of the limitations statutes, which is to "protect defendants from the stale claims of dilatory plaintiffs." (*Norgart v. Upjohn Co., supra,* 21 Cal.4th at p. 395.) Kitzig was not dilatory, and in fact would have been premature in bringing a lawsuit at a time when she still subjectively believed—and had an objective basis for believing—that there was nothing wrong with the treatment.

We additionally reject Dr. Nordquist's alternate contention that the limitations period was triggered when Kitzig first sought treatment from Dr. Simpson on November 21, 1994. Kitzig testified she saw Dr. Simpson on that date because she was concerned about a sore spot on her denture and she believed Dr. Nordquist was out of town. During this visit, Kitzig did not express any concern about Dr. Nordquist's care, and Dr. Simpson offered no advice about the treatment. Dr. Simpson's testimony was consistent with Kitzig's version of the events. Although Dr. Nordquist urged the jury to find the testimony of Dr. Simpson, Kitzig, and Kitzig's husband not credible, the jury was entitled to reject these arguments and find that Kitzig's first visit with Dr. Simpson did not reflect she suspected Dr. Nordquist of negligence or that she was put on notice of the negligence.

Substantial evidence supports the jury's finding that Kitzig's negligence claim was timely.[4]

## II. *Proposition 51 Allocation*

Dr. Nordquist contends the court erred in (1) refusing to instruct the jury that Dr. Tarr (the original treating dentist) could be held liable for "damages flowing from" Dr. Nordquist's negligent medical care; and (2) failing to require the jury to determine the portion of noneconomic damages that was attributable to Dr. Tarr's "fault" (Civ. Code, § 1431.2).

### A. *Factual and Procedural Background*

Before trial, the court granted Kitzig's motion to exclude evidence that she had settled with Dr. Tarr for $95,000. But the court noted that facts concerning Dr. Tarr's negligence and his connection to Kitzig's claimed injuries may be admissible to the extent Proposition 51 "is available as a remedy to [Dr.] Nordquist."

---

[4]Dr. Nordquist has not asserted any instructional error with respect to this issue.

During opening argument, Kitzig's counsel stated that Kitzig was seeking only "damages caused by Dr. Nordquist and Dr. Nordquist alone." In then presenting her case to the jury, Kitzig did not focus on her prior dental care, except to present evidence that she had previously sued Dr. Tarr for negligence and to suggest that Dr. Nordquist was negligent in urging her to discontinue her care with her subsequent dentist, Dr. Evasic, whose treatment involved shaving the three remaining teeth and providing a denture.

In his defense case, Dr. Nordquist presented evidence about Dr. Tarr. Dr. Nordquist's expert witness testified that Dr. Tarr violated the standard of care by extracting seven of Kitzig's upper teeth. He agreed that Dr. Tarr's extraction of these teeth made Kitzig "a more difficult case for any future dentist" because the loss of teeth led to further bone loss. Taking a somewhat contradictory position, Dr. Nordquist testified the implants that he placed into Kitzig's upper jaw "[h]ad nothing to do with Dr. Tarr's case." He said that Kitzig would still have "need[ed] bilateral sinus lifts to add bone" even if Dr. Tarr had not extracted those teeth. He testified, however, the sinus lift procedure would not have been "anywhere near as extensive." Dr. Nordquist also presented evidence that Dr. Smith, the defense expert in the Tarr case who briefly examined Kitzig after she began her treatment with Dr. Nordquist, caused Kitzig's infections and her pain and suffering.

After Kitzig's counsel opened the door to the subject, the court ultimately permitted Dr. Nordquist to introduce evidence that Kitzig had settled with Dr. Tarr in her previous malpractice action and the amount of the settlement was $95,000.

At the conclusion of the trial, Dr. Nordquist proposed an instruction informing the jury that "the law regards the negligence of the original dentist as a legal cause of the damages flowing from the later negligent dental treatment and holds the original dentist liable therefor." (*See Ash v. Mortensen* (1944) 24 Cal.2d 654 [150 P.2d 876].) The court rejected the instruction, but the court instructed the jury that Dr. Nordquist could be held liable even if others contributed to Kitzig's injuries. The court also instructed that Kitzig was not entitled to damages for an existing disability or condition, but she could recover for an "aggravation" of a preexisting condition and this recovery would be "limited to the additional injury caused by the aggravation." In the special verdict form, the jury was asked to determine the percentage fault of four individuals: (1) Kitzig; (2) Dr. Nordquist; (3) Dr. Smith; and (4) Dr. Berger (Kitzig's expert witness and treating oral surgeon at the time of trial). The jury found Dr. Nordquist was 95 percent at fault; Kitzig was 4 percent at fault; Dr. Smith was 1 percent at fault; and Dr. Berger was not at fault.

### B. *Proposition 51 Contention Waived*

Dr. Nordquist now contends the court erred in refusing to give his proposed jury instruction and failing to require the jury to consider Dr. Tarr's negligence in allocating fault for Kitzig's noneconomic damages. ■ Dr. Nordquist waived his right to assert these contentions by failing to properly raise the issue below. (See *Conrad v. Ball Corp.* (1994) 24 Cal.App.4th 439, 443-444 [29 Cal.Rptr.2d 441].) A defendant seeking a Proposition 51 offset for noneconomic damages attributable to another person's fault must propose a special verdict requesting this allocation. The record fails to disclose Dr. Nordquist made this request with respect to Dr. Tarr.

This waiver is not cured by Dr. Nordquist's proposed *Ash v. Mortensen* jury instruction. That instruction was meaningful only in combination with a request for an allocation in the special verdict. We likewise reject Dr. Nordquist's argument that other portions of the record demonstrate he requested the special verdict. Neither the court's brief comments during in limine motions nor Dr. Nordquist's counsel's statements at the posttrial motions hearing show he requested the Dr. Tarr allocation in a special verdict form.

### C. *No Proposition 51 Allocation for Dr. Tarr Was Necessary*

We alternatively conclude Dr. Nordquist's contention fails on its merits.

In *Ash v. Mortensen, supra,* 24 Cal.2d 654, the California Supreme Court held a tortfeasor responsible for the original accident is also jointly and severally liable for injuries occurring during medical treatment to treat injuries suffered in that accident. Under this rule, " 'subsequent negligent medical treatment is foreseeable as a matter of law' " because the "treatment 'is closely and reasonably associated with the immediate consequences of the defendant's act and forms a normal part of the aftermath.' " (*Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1606 [28 Cal.Rptr.2d 62].) In *Maxwell,* this court applied these principles to hold an original negligent doctor may be liable for injuries resulting from a subsequent doctor's medical care made necessary because of the first doctor's treatment. (*Id.* at p. 1606.)

This case is different from *Ash* and *Maxwell* because the issue was not the original tortfeasors' liability for the subsequent damages. Rather, the issue was the subsequent tortfeasor's liability for the subsequent damages *that he caused.* The jury was told that Kitzig had settled with Dr. Tarr before trial, and Kitzig made clear throughout the trial that she was only asking for damages caused by Dr. Nordquist.

Dr. Nordquist nonetheless argues the *Ash v. Mortensen* instruction was necessary because the jury was required to understand that—under Proposition 51—it could only award Kitzig's noneconomic damages attributable to Dr. Nordquist's fault. Dr. Nordquist says that because the law regards Dr. Tarr as jointly and severally liable for those later damages, the jury was required to apportion fault for the noneconomic damages between Dr. Nordquist and Dr. Tarr.

Proposition 51 was enacted to "address perceived inequities of plaintiffs joining 'deep pocket' defendants *'even though there was little or no basis for finding them at fault.'*" (*Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 626 [65 Cal.Rptr.2d 532], original italics.) To achieve this objective, the voters added Civil Code section 1431.2, subdivision (a), which declares: "In any action for *personal injury*, property damage, or wrongful death, *based upon principles of comparative fault*, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." (Italics added.) ■ Under this statute, a defendant's liability for noneconomic damages cannot "exceed that defendant's proportionate share of fault." (*Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1196 [74 Cal.Rptr.2d 580].) Those damages "must be apportioned among [the] '"universe" of tortfeasors' including 'nonjoined defendants'" and those who have settled with the plaintiffs. (See *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 603 [7 Cal.Rptr.2d 238, 828 P.2d 140]; *Roslan v. Permea, Inc.* (1993) 17 Cal.App.4th 110, 113 [21 Cal.Rptr.2d 66].)

Dr. Nordquist contends that apportionment was required here because the statute applies in any personal injury action based on comparative fault principles, and one court has applied comparative fault principles in an indemnity action between two tortfeasors, one of whom was liable under the *Ash v. Mortensen* doctrine. (See *Blecker v. Wolbart* (1985) 167 Cal.App.3d 1195, 1200-1201 [213 Cal.Rptr. 781] (*Blecker*).)

In *Blecker*, a pre-Proposition 51 case, a driver and motorcyclist collided, resulting in the motorcyclist's fracturing his forearm and thigh bone. (*Blecker, supra,* 167 Cal.App.3d at p. 1199.) The motorcyclist later died during corrective surgery; the death was caused by the negligence of an anesthesiologist. After the driver settled with the motorcyclist's heirs on their wrongful death claims, the driver sued the anesthesiologist for indemnity. (*Ibid.*) Concluding the trial court erred in instructing that the driver was

not a proximate cause of the motorcyclist's death, the reviewing court held the trial court should have instructed the jury on *Ash v. Mortensen* principles because that doctrine establishes the original tortfeasor is a proximate cause of the injury and is not relieved of liability because the medical malpractice is a substantial cause of the ultimate injuries. (*Id.* at pp. 1200-1204.)

*Blecker* is inapplicable here. The fact that Dr. Tarr was jointly and severally liable for all of Kitzig's damages under pre-Proposition 51 law and that it was appropriate under the prior law to compare the fault of two jointly and severally liable defendants in an indemnity action, does not resolve the issue before us. ■ Our focus is on whether Proposition 51 provides Dr. Nordquist with the right to shift responsibility for the *damages directly attributable to his conduct.* We conclude that under the circumstances here it would be inconsistent with Civil Code section 1431.2's statutory language and the policies underlying Proposition 51 to permit the second tortfeasor who was directly at fault for the aggravation of the plaintiff's injuries to reduce his or her liability for the noneconomic damages connected to those injuries because of the conduct of the original tortfeasor. Any other conclusion would turn Proposition 51 on its head and achieve precisely the opposite from the electorate's intent.

An original tortfeasor who is liable for a subsequent doctor's negligence based solely on *Ash v. Mortensen* principles may be said to be at "fault" in the broad sense of the word because that party's negligence created the necessity for the medical treatment and it is foreseeable that medical malpractice may occur during that treatment. But the nature of this fault is significantly different from the fault of the subsequently negligent medical defendant, whose conduct aggravated the plaintiff's injuries. The original tortfeasor has no control over the subsequent treatment, does not participate in the patient's care and has no opportunity to protect himself against the ensuing negligence. In this regard, *Ash v. Mortensen* reflects "a unique rule of causation more analogous to imputed negligence than joint feasance." (*Progressive Trans. Co. v. Southern California Gas Co.* (1966) 241 Cal.App.2d 738, 742 [51 Cal.Rptr. 116]; see *Niles v. City of San Rafael* (1974) 42 Cal.App.3d 230, 238-239 [116 Cal.Rptr. 733].)

Because of this imputed negligence concept, the pre-Proposition 51 courts held that although indemnity is generally not permitted between two active tortfeasors, this rule is inapplicable in a successive liability case when the original tortfeasor seeks indemnity as against the subsequently negligent medical defendant. (See *Niles v. City of San Rafael, supra,* 42 Cal.App.3d at pp. 238-239.) The courts reasoned that although the original tortfeasor's conduct may have been active vis-à-vis the injuries created by that conduct, the same is not true with respect to the injuries caused by the

subsequent medical defendants. (See *ibid.*) Because *the original tortfeasor's conduct is essentially passive with respect to the injuries caused by a medical malpractice defendant*, the original tortfeasor is entitled to seek indemnity for damages paid to compensate the plaintiff for those injuries.

This same reasoning applies when determining whether Proposition 51 permits allocation of fault from a subsequent tortfeasor to an original tortfeasor under *Ash v. Mortensen.* Under pre-Proposition 51 law, Dr. Tarr and Dr. Nordquist were independent actors; each could be held fully liable for injuries inflicted by Dr. Nordquist. But Dr. Tarr played no part in creating the actual injuries caused by Dr. Nordquist for which Kitzig sought compensation during this trial. Dr. Tarr's conduct was passive with respect to these injuries. Dr. Tarr did not participate with Dr. Nordquist in causing those injuries, and Dr. Tarr had no control or opportunity to protect himself against the subsequent negligence.

Given this lack of a connection between Dr. Tarr's conduct and the damages sought by Kitzig in this trial, there was an insufficient basis to permit the jury to shift the responsibility for noneconomic damages from Dr. Nordquist and allocate the responsibility to Dr. Tarr. A contrary conclusion would undermine the fundamental purpose underlying Proposition 51, which is to ensure that the person who is at fault for inflicting the noneconomic damages bears the monetary burden for those damages.

In urging us to hold an allocation was required, Dr. Nordquist focuses on the evidence establishing a causal nexus between Dr. Tarr's negligence and its aggravation by Dr. Nordquist. For example, he points to the evidence showing that Dr. Tarr's decision to extract the seven teeth made it necessary for Dr. Nordquist to perform more complicated dental procedures, increasing the probability that Dr. Nordquist would commit negligence. This argument misses the point. While Dr. Tarr was a proximate cause of the damages suffered by Kitzig and therefore could be jointly and severally liable for all economic damages, this form of proximate cause is not necessarily equivalent to fault analysis under Proposition 51. Fault connotes some form of active participation in creating the injuries for which the plaintiff seeks to recover. There was no evidence that Dr. Tarr was *at fault* with respect to the noneconomic damages suffered *in connection with Dr. Nordquist's negligence.* The fact that Dr. Tarr may have placed Kitzig in the situation where she needed more complicated dental care is not the same as saying that Dr.

Tarr should bear financial responsibility under Proposition 51 *for Dr. Nordquist's conduct alone.*[5]

Dr. Nordquist has not cited, nor have we found, any reported cases holding Proposition 51 requires apportionment under the circumstances here where (1) the first tortfeasor's liability is premised solely on *Ash v. Mortensen*; (2) the plaintiff has settled with the first tortfeasor and has presumably recovered all of her economic and noneconomic damages flowing from that tortfeasor's alleged negligence; and (3) the jury was told to award damages (economic and noneconomic) against the subsequent tortfeasor attributable *only* to that second tortfeasor's conduct in aggravating the initial injuries. We hold a Proposition 51 allocation was not required under these circumstances.

### III.-VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed. The parties to bear their own costs on appeal.

McDonald, J., concurred.

**O'ROURKE, J.,** Concurring and Dissenting.—I respectfully dissent. I disagree with that portion of the majority's opinion holding that Kitzig presented evidence from which the jury could reasonably infer "she did not suspect her continuing dental problems were caused by Dr. Nordquist's wrongdoing." (Maj. opn., *ante* at p. 1394.) The majority's holding ignores settled law on accrual of causes of action and the delayed discovery exception to the statute of limitations, and is contrary to Kitzig's unequivocal admission that over one year before she filed suit she "suspected [Dr. Nordquist] did something wrong" to her, prompting her to seek out another dentist's opinion. The majority's unprecedented "meaningful suspicion" rule effectively creates a new tolling rule permitting a malpractice plaintiff who (a) experiences the effects of actual malpractice and (b) actually suspects her physician's negligence, to toll the statute of limitations indefinitely until another healthcare provider expressly confirms or diagnoses the negligent treatment. Such a rule is not the law in California.

---

[5]By contrast, the court did properly require the jury to consider allocating fault to Dr. Smith and Dr. Berger. Dr. Nordquist submitted facts from which the jury could find that each of these medical professionals was responsible for inflicting the same injuries for which Dr. Nordqist was being sued.

*See footnote 1, *ante*, page 1384.

At issue is the proper interpretation and application of the discovery exception to the one-year statute of limitations of Code of Civil Procedure section 340.5 (section 340.5). *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383 [87 Cal.Rptr.2d 453, 981 P.2d 79] (*Norgart*) contains the California Supreme Court's most recent discussion of statutes of limitations, accrual of causes of action and section 340.5's discovery rule. In *Norgart*, the court explained: " 'Statute of limitations' is the 'collective term . . . commonly applied to a great number of acts,' or parts of acts, that 'prescribe the periods beyond which' a plaintiff may not bring a cause of action. [Citations.] It has as a purpose to protect defendants from the stale claims of dilatory plaintiffs. [Citations.] It has as a related purpose to stimulate plaintiffs to assert fresh claims against defendants in a diligent fashion. [Citations.] Inasmuch as it 'necessarily fix[es]' a 'definite period[] of time' [citation], it operates conclusively across the board, and not flexibly on a case-by-case basis. [Citations.]" (21 Cal.4th at p. 395.)

Recognizing that courts have described the affirmative defense based upon the statute of limitations as both "favored" for providing repose and "disfavored" for promoting disposition on the merits, the court in *Norgart* clarified that the affirmative defense should not be characterized as favored or disfavored because both stated public policies are "equally strong, the one being no less important or substantial than the other." (*Norgart, supra,* 21 Cal.4th. at p. 396.) Regardless of the policies, *Norgart* makes it clear it is for the Legislature alone to establish the period under any statute of limitations. (*Ibid.*) A plaintiff, of course, must file suit within the limitations period after accrual of the cause of action. (*Norgart, supra,* 21 Cal.4th at p. 397.)

*Norgart* summarized the accrual rules as follows: "The general rule for defining the accrual of a cause of action sets the date as the time 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises . . . .' [Citation.] In other words, it sets the date as the time when the cause of action is complete with all of its elements [citations]—the elements being generically referred to by sets of terms such as 'wrongdoing' or 'wrongful conduct,' 'cause' or 'causation,' and 'harm' or 'injury' [citations]." (*Norgart, supra,* 21 Cal.4th at p. 397.)

Under the "discovery rule," accrual of a cause of action is postponed until the plaintiff actually discovers, or has reason to discover, the elements of the cause of action. (*Norgart, supra,* 21 Cal.4th at p. 397; *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110 [245 Cal.Rptr. 658, 751 P.2d 923].) Addressing a cause of action for wrongful death, the court explained that the date of accrual is the "date on which the plaintiff comes at least to suspect, or have

reason to suspect, a factual basis for its elements." (*Norgart, supra,* at p. 405.) *Norgart* explains that determination is assessed, at least in part, from the layperson's viewpoint: "[A] plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, . . . when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation], 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding' [citation]." (*Id.* at pp. 397-398.) *Norgart* makes clear that discovery of a cause of action is met by mere *suspicion* of wrongdoing; contrary to Kitzig's arguments on appeal, the plaintiff need not have actual knowledge of the elements of her claim.[1] As the majority points out, reaching the point of actual suspicion differs from the point at which one reasonably should suspect her physician was negligent, although both will trigger the statute. Under the latter standard, plaintiff has reason to suspect wrongdoing when she has notice or information of circumstances *to put a reasonable person on inquiry*; she need not know the specific facts necessary to establish the cause of action. (*Norgart, supra,* at p. 398; *Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at p. 1110-1111.) Harsh a rule as it may be, our high court unambiguously holds that where the plaintiff does not have actual suspicion of wrongdoing, the statute in any event can begin to run when a plaintiff reaches the point of inquiry notice, that is, when she has information prompting a reasonable person to make inquiry about her claim, not when she confirms the accuracy or validity of her suspicions or acquires sufficient evidence to succeed on her claim. (Cf. *Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d at p. 1111 [the acquisition of specific "facts" necessary to establish a claim is a process contemplated by pretrial discovery].)

Kitzig argued on appeal that the jury was entitled to base its finding the statute did not begin to run upon "circumstantial evidence" contradicting her direct admission that she actually suspected Dr. Nordquist's wrongdoing. The majority agrees, holding there is evidence demonstrating Kitzig never reached the "requisite" suspicion to trigger the statute in the first place. As I explain, Kitzig's admission, together with evidence of her physical condition at the time, demonstrates suspicion of wrongdoing sufficient to trigger the

---

[1] In *Norgart* the court explained that language from *Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d 1103 should not be read to require "knowledge" as long as suspicion of all the elements exists: "Not inconsistent with the proposition that the plaintiff discovers the cause of action when he at least suspects a factual basis for its elements, even if he lacks knowledge thereof, is language like that which appears in *Jolly,* to the effect that a 'suspicion' of one or more of the elements of a cause of action, 'coupled with a knowledge' of the others, 'will commence the [applicable] limitations period.' [Citation.] *Such words do not cast doubt on the sufficiency of suspicion of the elements of a cause of action without knowledge.*" (*Norgart, supra,* 21 Cal.4th at p. 398, fn. 3, italics added.) Thus, Kitzig's suspicion of negligence by Dr. Nordquist is sufficient to meet the test.

statute of limitations. The majority's holding that the evidence shows Kitzig did not actually reach that suspicion is flawed because the evidence either does not support the majority's characterization, or is legally irrelevant to a proper statute of limitations analysis.

At trial, Kitzig admitted that as of May 20, 1994 she suspected that Dr. Nordquist had committed wrongdoing to a degree that caused her to consult with another dentist:

"Q. [Defense counsel] . . . Prior to this date of January 12, 1995, did you, in your own mind, ever think that Dr. Nordquist had done anything wrong?

"A. [Kitzig] The only time I found out that Dr. Nordquist did anything wrong was March 21st when Dr. Simpson told me they [the implants] were all failing.

"Q. [Defense counsel] Well, my question's a little different. I'm asking did you ever suspect, not that you were told, but did you ever suspect that Dr. Nordquist had done something wrong?

"A. [Kitzig] I suspected he did something wrong when that hole was there.

"Q. [Defense counsel] When did you first suspect that Dr. Nordquist had done something wrong?

"A. [Kitzig] I think it was when I went to—to LA to the UCLA [sic] for the doctor to check that hole that water and bubbles were coming out of. [¶] . . . [¶]

"Q. [Defense counsel] You went to see that UCLA doctor on May 20, 1994; is that correct?

"A. [Kitzig] Yes.

"Q. [Defense counsel] And I think you said at that point in time you thought Dr. Nordquist had done something wrong?

"A. [Kitzig] I was suspicious because I had that hole in my sinus and water and bubbles were coming out, yes.

"Q. [Defense counsel] So you were suspicious that Dr. Nordquist had done something wrong?

"A. [Kitzig] Yes. [¶] . . . [¶]

"Q. [Defense counsel] Mrs. Kitzig, was your chief complaint when you went to see the doctor at UCLA that you wanted the truth about what your dentist was planning to do?

"A. [Kitzig] I wanted him to examine the implants and tell me about that hole in my sinus.

"Q. [Defense counsel] And that's because you suspected at that point in time your state of mind was that Dr. Nordquist had done something wrong; correct?

"A. [Kitzig] I had suspected so, yes."

At the time of her visit to Dr. Nishimura, Kitzig was aware that an implant had entered her sinus; she had been told by Dr. Nordquist that she had a "hole in [her] sinus" that would probably close on its own; and she was experiencing food and bubbles exiting from her nose as a result of the hole. At this point, Kitzig had "discovered" her cause of action: she had knowledge of injury (the opening); suspicion of wrongdoing; and suspicion that the injury was caused by Dr. Nordquist's improper care. Her admission of suspected negligence, together with her testimony describing the physical conditions that prompted her visit to Dr. Nishimura, conclusively establish that the statutory period commenced in May 1994. (See, e.g., *Norgart, supra,* 21 Cal.4th 383, 405-406 [plaintiff's admissions that around the time of his daughter's death he suspected that "something wrong" had happened to her to cause her death and that he had formed a belief that an "individual or individuals" did something wrong to cause her to take her own life, including her psychiatrist's professional negligence, held sufficient to establish suspicion of factual basis for and accrual of wrongful death cause of action]; *Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 102 [132 Cal.Rptr. 657, 553 P.2d 1129] (*Sanchez*) [regardless of a possibility of an earlier commencement, plaintiff's deposition testimony established the statute of limitations began to run upon plaintiff's release from the hospital, at which time she thought defendants " 'had done something wrong because of all the time that I stayed there suffering' "]; *Gray v. Reeves* (1977) 76 Cal.App.3d 567, 572, 576-577 [142 Cal.Rptr. 716] [plaintiff admitted in his deposition that he knew defendants "did something wrong" by prescribing medication; that admission, combined with plaintiff's prior knowledge of hip problems, established commencement of the statute of limitations]; *Graham v. Hansen* (1982) 128 Cal.App.3d 965, 972-973 [180 Cal.Rptr. 604] [plaintiff's action was barred by the statute of limitations as a matter of law where plaintiff

testified that before she was released from the hospital she suspected her doctor committed malpractice; plaintiff had information with respect to her injury and its cause sufficient to place a reasonable person on inquiry as to the probability of actionable conduct on the part of defendants].) Because the evidence demonstrates, as a matter of law, that the statutory period commenced over one year before Kitzig filed her lawsuit, her negligence claim against Dr. Nordquist is barred.

The majority concedes the statute of limitations is commenced where there is evidence a person actually suspects " ' "that someone has done something wrong" to him.' " (Maj. opn., *ante*, at p. 1393, citing *Norgart* and *Sanchez*.) It further concedes that a patient's reliance on her physician's assurances that his treatment is adequate "may not be justified if the patient actually suspects wrongdoing." (*Ibid.*, citing *Sanchez*.) But the majority proceeds to hold the patient's suspicion must be "meaningful by having some effect on the patient's ongoing relationship with her doctor." (*Ibid.*, citing *Brown v. Bleiberg* (1982) 32 Cal.3d 426, 438, fn. 9 [186 Cal.Rptr. 228, 651 P.2d 815] (*Brown*).) In footnote 9, *Brown* addressed the rule that, during the continued physician/patient relationship, a patient is entitled to rely upon the physician's assurances to lessen her duty to discover her cause of action. (See *Sanchez, supra,* 18 Cal.3d at p. 102; *Unjian v. Berman* (1989) 208 Cal.App.3d 881, 885 [256 Cal.Rptr. 478] (*Unjian*).) As the majority acknowledges, however, the continuing physician-patient relationship exception presumes that an injured plaintiff has not yet discovered or suspected physician negligence as the cause of her injuries due to her physician's assurances to the contrary. In *Unjian*, the court explained: "Where . . . the injury is obvious but *there is nothing to connect that injury to defendant's negligence* it cannot be said as a matter of law the plaintiff's failure to make an earlier discovery of fault was unreasonable. [Citation.] This is especially true in cases . . . where the plaintiff continues under the doctor's care, does inquire about the cause of his apparent injury and is given an explanation calculated to allay any suspicion of negligence on the doctor's part." (*Unjian, supra,* 208 Cal.App.3d at p. 885 italics added; see also *Brown, supra,* 32 Cal.3d at p. 434 [court held summary judgment inappropriate because "reasonable minds could differ . . . as to the sufficiency of plaintiff's explanation that she was prevented from suspecting defendants' negligence by Dr. Bleiberg's misrepresentations about the nature of the surgery he performed and why he performed it"].)

The physician-patient relationship exception has no application here because Kitzig actually suspected Dr. Nordquist's negligence when she visited Dr. Nishimura at UCLA on May 20, 1994. Nevertheless, even under the majority's cited authority, its novel "meaningful suspicion" test would be

met in this case. In *Brown*, the court explained that a patient's reliance on the fiduciary role of her doctor can continue even after their relationship ends, assuming there is no evidence suggesting the patient *lost trust* in her doctor. It said: "During the continuation of the [physician/patient] relationship, courts have given plaintiffs the benefit of an 'assumption' of continued reliance so that the tolling effect of nondisclosure or concealment will also continue absent unusual circumstances which should put the patient on notice thereof. [Citations.] Such reliance on the fiduciary role of the physician may naturally continue after the physician-patient relationship has terminated, though. [Citation.] There was nothing in the circumstances in which plaintiff discontinued her treatment by Dr. Bleiberg *to suggest any loss of trust in him.*" (*Brown, supra,* 32 Cal.3d at p. 438, fn. 9, italics added.)

Contrary to the circumstances in *Brown*, the evidence here demonstrates Kitzig lost trust in Dr. Nordquist because she *ignored Dr. Nordquist's assurance* that the hole was nothing unusual, and, fearing his negligence, proceeded to make inquiry about his treatment with a second dentist. In short, Kitzig did not believe Dr. Nordquist. "If evidence exists which shows that the patient does not take the physician's 'assurances at face value,' then it may be . . . that the 'diminished duty to discover period' has either terminated or has been attenuated." (*Unjian, supra,* 208 Cal.App.3d at p. 887; see *Sanchez, supra,* 18 Cal.3d at p. 102.) Thus, even assuming Kitzig had not already suspected negligence but rather operated under only a diminished duty to discover Dr. Nordquist's negligence during his ongoing treatment, that period of diminished duty terminated (and she reached a "meaningful suspicion") when she rejected Dr. Nordquist's assurances and sought an opinion from Dr. Nishimura.

The majority's reliance on the "continuous representation" doctrine to find Kitzig's suspicion allayed by Dr. Nishimura's statements is misplaced. Although that doctrine permits a patient to reasonably rely upon her *negligent doctor's* advice and assurances (absent, of course, the patient's discovery of her cause of action), it has not been extended to advice by any other physician with whom the patient consults. If the Legislature intended the law to be that a plaintiff may reasonably rely upon any physicians' comforting advice regardless of her suspicions, it would enact an express tolling exception in section 340.5 similar to that within the legal malpractice statute of limitations. (§ 340.6; *Laird v. Blacker* (1992) 2 Cal.4th 606, 609 [7 Cal.Rptr.2d 550, 828 P.2d 691] [the statute of limitations for legal malpractice is tolled during the times, inter alia, when "the negligent attorney continues to represent the client"].) As *Norgart* pointed out, it is for the Legislature, not courts, to carve tolling exceptions to the statute of limitations.

Also flawed is the majority's reasoning that Kitzig's suspicions were insufficient because they did not pertain to the "injury" serving as the basis of her negligence claim. (Maj. opn., *ante* at p. 1392.) Specifically, the majority claims that at trial Kitzig's experts did not identify the creation of the sinus hole as a specific instance of Dr. Nordquist's negligence. (Maj. opn., *ante*, at p. 1393.) This claim is contradicted by Kitzig's expert's testimony that Dr. Nordquist's negligence began at the outset when he formulated his treatment plan and was evidenced by, among other things, "perforations into sinuses." Even Kitzig argued on appeal that Dr. Nordquists's failing bone augmentations caused the implants to push up into her sinus. More importantly, the majority's approach departs from settled law that "injury," as used in section 340.5, is not synonymous with the wrongdoing or negligent act. Rather, injury refers to evident, appreciable harm or detrimental effect of wrongdoing. (*Larcher v. Wanless* (1976) 18 Cal.3d 646, 655, 656, fn. 11 [135 Cal.Rptr. 75, 557 P.2d 507] ["injury" is a word of art which refers to the damaging effect of the negligence rather than the act of negligence itself and thus often refers to an event occurring some time after the commission of a wrongful act]; *Steketee v. Lintz, Williams & Rothberg* (1985) 38 Cal.3d 46, 54 [210 Cal.Rptr. 781, 694 P.2d 1153] [" 'Wrongful act' and 'injury' are not synonymous"]; *Brown, supra*, 32 Cal.3d at p. 437, fn. 8 [elaborating that a plaintiff's injury occurs at the point at which appreciable harm was first manifested].); *Marriage & Family Center v. Superior Court* (1991) 228 Cal.App.3d 1647, 1652 [279 Cal.Rptr. 475].) Based on her and her own expert's testimony, there can be no doubt Kitzig, at the time of her UCLA visit, was experiencing the damaging effects of Dr. Nordquist's negligence.

Contrary to the majority's view, the jury's finding on the statute of limitations is not supported by substantial evidence. In order for evidence to be substantial, it must be of ponderable legal significance, reasonable in nature, credible, and of solid value. (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Buckley* v. *California Coastal Com.* (1998) 68 Cal.App.4th 178, 192 [80 Cal.Rptr.2d 562]; *Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 51-52 [248 Cal.Rptr. 217].) Although inferences can serve as substantial evidence, the trier of fact may not " 'indulge in inferences rebutted by clear, positive and uncontradicted evidence. [Citation.]' [Citation.]" (*Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1487 [71 Cal.Rptr.2d 179].) Kitzig's admission that she suspected Dr. Nordquist's wrongdoing simply cannot be contradicted by inferences that might be drawn from her return to Dr. Nordquist for further treatment.

Further, under the substantial evidence standard, while we examine the facts in the light most favorable to Kitzig, "resolv[ing] all explicit conflicts

in the evidence in favor of the respondent and presum[ing] in favor of the judgment all reasonable inferences" (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632 [29 Cal.Rptr.2d 191], italics omitted) this does not mean the court may affirm a judgment on inferences that do not "rest on the evidence." (*Ibid.*) Here, the evidence does not support several of the majority's characterizations. For example, Kitzig's visit to Dr. Nishimura cannot reasonably be characterized as a "second opinion based on a subjective 'concern' with a patient's ongoing treatment." (Maj. opn., *ante*, at p. 1393.) There is a significant difference between obtaining a second opinion about a doctor's medical conclusion or treatment decision, and making inquiry with another doctor specifically to ascertain whether your first doctor committed negligence. The only inference a jury can reasonably draw from the testimony surrounding the purpose of Kitzig's visit with Dr. Nishimura is that the latter occurred.

Nor does the evidence support the majority's characterization of Dr. Nishimura's statement to Kitzig as an assurance that Dr. Nordquist was " 'doing nothing wrong.' " (Maj. opn., *ante*, at p. 1393.) Dr. Nordquist had advised Kitzig that the hole in her sinus would probably close on its own, yet, according to Kitzig and her husband, Dr. Nishimura told her to "go back and get the hole closed." Dr. Nishimura's advice clearly contradicted Dr. Nordquist's sanguine assessment of the hole. Similarly, the jury cannot reasonably draw an inference that, upon Kitzig's return, Dr. Nordquist gave Kitzig express assurances that his treatment was adequate. The evidence indicates that the "assurances" by Dr. Nordquist after her UCLA visit were not assurances that his past treatment was satisfactory or explanations that Kitzig's problems were attributable to something other than his inadequate care.[2] At best, Kitzig's testimony demonstrates that Dr. Nordquist concealed information, e.g., Dr. Nordquist never told her and her husband that anything was wrong; Dr. Nordquist never told her that he could not perform the sinus surgery. In any event, after a plaintiff discovers the nature of her injury and its negligent origin thus triggering the one-year limitations period, concealment by the defendant is irrelevant. "[N]ondiscovery will toll the running of the one-year provision for adults. Concealment by the defendant physician will not toll this period if discovery has occurred. [Citations.]" (*Young v. Haines* (1986) 41 Cal.3d 883, 901 [226 Cal.Rptr. 547, 718 P.2d 909]; *Sanchez, supra,* 18 Cal.3d at pp. 98, 100-101 ["The applicable decisional law . . . has rejected any notion that nondisclosure by defendant would toll the

---

[2]Kitzig's record citation does not support her claim that Dr. Nordquist told her "everything was okay" after her visit with Dr. Nishimura. The testimony she cites is her husband's testimony as to what *Dr. Simpson* told them when they inquired about the fit and appearance of her denture. Kitzig's husband did testify that up to the time they returned to Dr. Nordquist after the UCLA visit, he never told them anything was wrong, that "[e]verything is fine, as far as we were concerned."

statute despite discovery by plaintiff"].) Assuming a jury could reasonably infer Dr. Nordquist somehow gave Kitzig the impression that "everything was okay" after her visit with Dr. Nishimura, such assurances made by Dr. Nordquist *after* May 20, 1994 would be relevant only to toll the three-year limitations period of section 340.5, not the one-year period.

The evidence also fails to support the majority's reasoning that Kitzig "should not . . . be expected to file a lawsuit against her current doctor when she subjectively and justifiably believes the lawsuit would be meritless." (Maj. opn., *ante*, at p. 1394.) Kitzig may have subjectively believed that Dr. Nordquist did nothing wrong after her visit with Dr. Nishimura, but as indicated by her experts' testimony, she had ample justification and legal basis at that time to file a lawsuit against Dr. Nordquist based upon his manifest negligent care and treatment.[3] Because her suspicions were reasonably founded, a lawsuit brought at that time would not have been premature. (*Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 896-897 [218 Cal.Rptr. 313, 705 P.2d 886] [when a patient's reasonably founded suspicions have been aroused and she has actually become alerted to the necessity for investigation and pursuit of her remedies, the one-year period for suit begins].)

Finally, evidence sufficient to support a jury verdict must actually be " 'substantial' proof of the essentials which the law requires in a particular case." (*Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 260 [45 Cal.Rptr.2d 90].) In other words, if evidence (or an inference drawn from evidence) supports a legally untenable proposition, it cannot serve as substantial evidence to support a judgment. Facts supporting erroneous legal principles are not of ponderable legal significance nor possessed of solid value. (See, e.g., *Zemke v. Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 798 [69 Cal.Rptr. 88, 441 P.2d 928].) The inferences advanced by Kitzig and adopted by the majority to uphold the jury's finding on the statute of limitations are without ponderable legal significance because (1) they are contradicted by Kitzig's express admissions; and (2) they are used to buttress a faulty premise: that suspicion of wrongdoing sufficient for a patient to make inquiry about possible negligence must be confirmed by another physician or accompanied by a change in the doctor/patient relationship. Consequently, I give such facts no weight in the search for substantial evidence to support the jury's finding.

---

[3]Specifically, by the time Kitzig visited Dr. Nishimura, Dr. Nordquist had implemented the negligent treatment plan using artificial bone material; Kitzig had suffered breathing problems caused by infections stemming from her October 1992 surgery (maj. opn., *ante*, at p. 1388); she had implants fail and enter her sinus; and she was experiencing repeated problems from the opening in her sinus. Dr. Berger testified that Kitzig had "problems from day one" stemming from Dr. Nordquist's incorrect diagnosis and negligence, including "implants into sinuses; perforations into sinuses; sinus infections; infected implants; [and] lost implants."

For these reasons, I would reverse the judgment and order denying the motion for partial judgment notwithstanding the verdict as to Kitzig's negligence cause of action because no substantial evidence supports the jury's finding as to the statute of limitations. Given my conclusion, I would not reach the issue relating to Proposition 51, as it would have no application to Kitzig's remaining breach of contract claim.

I concur with the remainder of the majority's opinion.

The petition of defendants and appellants for review by the Supreme Court was denied October 3, 2000.